IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DEANIE HENSLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Case No. <u>CIV-20-54-JD</u> |
| vs. | ) |
| | ) **COMPLAINT** |
| STATE OF OKLAHOMA, ex rel the | ) **JURY TRIAL DEMANDED** |
| Regional University System of the | ) |
| Oklahoma Board of Regents d/b/a | ) |
| Northeastern State University, | ) |
| | ) |
| and | ) |
| | ) |
| STEVEN TURNER, in his individual | ) |
| capacity, | ) |
| | ) |
| and | ) |
| | ) |
| RANDY GROGAN, | ) |
| | ) |
| Defendants. | ) |

Plaintiff Deanie Hensley, by and through her undersigned counsel, complains as follows:

## NATURE OF THE CLAIMS

1. This is a hostile work environment case of sexual harassment and retaliation brought pursuant to 20 U.S.C. 1681 et seq. (Title IX of the Education Amendments of 1982), 42 U.S.C. 2000e (Title VII of the Civil Rights Act of 1964), 42 U.S.C. Sec. 1983, and Oklahoma common law.

## PARTIES AND JURISDICTION

2. At all relevant times herein, Plaintiff Deanie Hensley (hereinafter "Hensley" or "Plaintiff") worked for Defendant State of Oklahoma, ex rel the Regional University System of the Oklahoma Board of Regents d/b/a Northeastern State University (hereinafter "NSU").

3. Plaintiff is a woman.

1

4. Defendant NSU receives federal financial assistance from the United States Department of Education, and is a public entity located in Oklahoma City, Oklahoma, which controls the operations of Northeastern State University, maintaining its main campus in Tahlequah, Oklahoma.

5. At all relevant times herein, NSU employed Defendant Steven Turner, who is sued in his individual capacity, as the President of Northeastern State University.

6. At all relevant times herein, Defendant Randy Grogan was Plaintiff's coworker and an employee of Defendant NSU.

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue is proper in this district pursuant to 42 U.S.C. § 2000e-5(f)(3), because the alleged unlawful practices took place in the state of Oklahoma, and because Defendant NSU can be found in this district.

8. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on July 15, 2019, and an amended Charge on August 8, 2019. More than 180 days have passed since the filing of the initial Charge. Plaintiff has received a Notice of Right to Sue. This Complaint is being filed less than 90 days from receipt of her Notice of Right to Sue.

## FACTUAL ALLEGATIONS

9. Ms. Hensley was hired by NSU in or about October 2006. Her initial position was Accounting II.

10. In or about January 2007, NSU promoted Ms. Hensley to be Assistant Director of Auxiliary Services for NSU, in which role she helped to manage the entire Auxiliary Services department.

11. Ms. Hensley worked on NSU's Tahlequah campus.

12. Tim Foutch was Defendant NSU's Vice President from the beginning of Ms. Hensley's employment through approximately 2013 or 2014.

13. From in or about April 2009 through 2012, Ms. Hensley's supervisor was Randy Shelton, Director of Auxiliary Services.

14. Chris Adney became Director of Auxiliary Services from about 2014 through the end of Ms. Hensley's employment with Defendant NSU.

15. Randy Grogan, Ms. Hensley's coworker within Auxiliary Services, was Manager of Custodians from in or about 2009 to in or about 2017, and Event Coordinator from in or about 2017 through the present.

16. The Auxiliary Department maintained a sexist and sexually offensive culture throughout Ms. Hensley's tenure at NSU, with supervisors' sexually inappropriate conduct encouraging and enabling their supervisees to engage in the same behavior without fear of consequences.

17. For instance, beginning in or about 2009, Ms. Hensley heard her supervisor Randy Shelton make frequent sexually offensive remarks, including but not limited to comments about a woman's body or how she was dressed.

18. Several times per week, Shelton showed sexual cartoons to staff members, including on his cell phone, in Ms. Hensley's presence.

19. In or about 2009 to 2010, Ms. Hensley complained to Vice President Foutch about Shelton's obscene sexual comments and his practice of showing the staff sexual cartoons, telling him that she found these behaviors offensive.

20. Shelton continued make offensive sexual remarks following this complaint.

21. Defendant NSU took no action on Shelton's sexually offensive conduct, and he was ultimately fired, upon information and belief, for unrelated conduct.

22. Beginning in or about Ms. Hensley heard 2009 Defendant Randy Grogan made offensive sexual comments and remarks several times per week, including but not limited to comments about women's bodies to the effect "Dang, check out how short her skirt is," "you can see right through her dress," "look at how tight her pants are," comments about administrative assistant Jamie Giles's shirt being low cut, and comments about employee Kim Dawson's rear end.

23. Grogan made no attempt to conceal what he was doing. He made these remarks loud enough to be heard by anyone in his vicinity, which included their Supervisor, first Shelton and then Adney.

24. Shelton and Adney would laugh or smirk after Grogan made these comments.

25. Ms. Hensley regularly remarked to Dawson that Grogan's comments were disgusting and inappropriate.

26. Dawson later informed Ms. Hensley that in or about 1999 to 2000, when she was a student, Grogan had stolen her bra and panties from the dryer. Dawson also informed Ms. Hensley that she believed Grogan had spied on students at the pool during the same timeframe. Dawson told Ms Hensley that she believed Grogan had been banned from certain locations on campus previously.

27. In or about 2016, Ms. Hensley's then-supervisor Chris Adney began making offensive sexist remarks to Ms. Hensley concerning her appearance approximately every two weeks. By way of example only, and without limitation, during a meeting with department supervisors, Adney commented that "speaking of mullets, it's Deanie's turn to speak."

28. As another example, Adney stated that a student who was shivering in the cold didn't want to come inside at Hensley's urging, because "he took one look at Deanie and said, not with you!"

29. In or about March 2016, Ms. Hensley complained about Adney's offensive sexist remarks to Human Resources.

30. In or about April 2016, Ms. Hensley confronted Adney directly about his offensive comments.

31. Defendant NSU took no action in response to Ms. Hensley's complaints about Adney.

32. Upon learning that Ms. Hensley had complained about him to Human Resources, Adney retaliated against Ms. Hensley. For example, he excluding her from meetings in which she had previously been included; rescinded her access to his calendar; and in October 2016, issued her the worst

evaluation she had ever received during her employment at NSU.

33. In further retaliation for her complaints, Adney began reallocating Ms. Hensley's duties, such as interviewing student workers, managing student time-cards, and payroll, to Administrative Assistant Giles, which Ms. Hensley understood to be a sign that he intended to terminate her employment.

34. Randy Grogan stopped speaking to Ms. Hensley altogether following her complaint about Adney.

35. As a result of Adney's increasing actions to strip her of her duties following her complaint, Mr. Grogan's ostracizing her, and all of the hostile inappropriate comments Adney had made or witnessed without objection, Ms. Hensley concluded Adney would imminently terminate her employment, or recommend that her employment be terminated, which would have had the same effect.

36. Believing her choices were to continue to bear the brunt of Adney's retaliation, until he caused her termination, and then suffer unemployment and a black mark on her record, or take early retirement at the age of 55, which would take her off of NSU's payroll, and provide a significantly smaller income, she chose the lesser of the two evils.

37. Due to the decrease in income from the early retirement, Ms. Hensley was forced to sell her house earlier than she had wanted or planned to.

38. NSU had contracted with JD Young to provide its mail services in or about May 2017. JD Young was interested in hiring Ms. Hensley specifically due to her familiarity with the NSU campus and personnel, which would facilitate JD Young's transition into business in the area.

39. In order to keep earning income, in or about May 2017, Ms. Hensley accepted a position with JD Young, Inc., managing mail delivery for Defendant NSU.

40. Ms. Hensley was directly employed by both NSU and JD Young from on or about May 8, 2017 through her retirement from direct employment with NSU on or about September 1, 2017.

41. Thereafter Defendant NSU and JD Young jointly employed Ms. Hensley from May

2017 through the end of her employment.

42. JD Young was physically located in the basement of NSU's University Center, and Ms. Hensley was required to work within these offices to perform her job.

43. The work Ms. Hensley performed—managing mail delivery for the university—was part of NSU's regular course of business, and Ms. Hensley used NSU facilities, systems and materials.

44. NSU regularly assigned projects to Ms. Hensley which she was required to complete by a specific time as part of her work; for example, NSU authorities would direct her to take a package to another campus, or would direct her to get a particular delivery of bulk mail out by a specific time.

45. NSU employees supervised the work Ms. Hensley performed.

46. NSU had discretion over when and how long Ms. Hensley could perform her work.

47. NSU had the power to terminate Ms. Hensley's employment.

48. Although she was no longer on its payroll, NSU had the power to bar her from working on its premises, and on its account, at JD Young. As discussed below, NSU exercised that power, with the knowledge that doing so would cause her employment at NSU and JD Young, her joint employers, to terminate. NSU thus had and exercised the power to terminate her employment.

49. NSU's Auxiliary Services Department was located on the third floor of the University Center, and Grogan's office was located on the second floor.

50. In or about October through November 2018, Grogan began coming down to the office in the basement of the University Center where she worked approximately two to three times per week. Whereas he had previously not spoken to Ms. Hensley, now Grogan began commenting upon her physical appearance on these unwanted visits, telling her she had "lost weight" and was "looking good." These comments were offensive in the same way his comments about his female coworkers had been when she was on NSU's payroll.

51. By saying that Ms. Hensley had lost weight and was now looking good, Grogan implied

she had been overweight. His approval of his female coworkers was as ever based on their appearance, which was discriminatory.

52. The hostile work environment that Adney had fostered previously, with Grogan, was now unexpectedly a problem again.

53. Ms. Hensley's coworkers noticed that Grogan was present in the area in which Ms. Hensley worked more frequently than he had been prior to Ms. Hensley assuming her duties through JD Young.

54. On January 18, 2019, Grogan came down to JD Young's offices and spoke to Ms. Hensley. Suddenly he reached across the counter and put her hands down her jeans, with the backs of his fingers against her stomach. He reached down to her panty line. He then pulled her belt buckle and shook it, commenting on how she had been "losing weight."

55. Ms. Hensley told Grogan that she had to run errands and immediately left the office, shaken and traumatized by the assault. She struggled to regain composure.

56. On or about January 20, after having nightmares due to Grogan's actions, Ms. Hensley called a sexual assault hotline, stating that she had been assaulted. She was referred to Help in Crisis, a sexual assault support and advocacy organization.

57. On January 21, Ms. Hensley reported Grogan's assault to Defendant's Chief of Police Buhl.

58. Ms. Hensley informed JD Young Human Resources Director Andrea Wilson that she had made a complaint to the NSU campus police.

59. On each of January 21 and 22, 2019, Ms. Hensley saw Grogan's vehicle parked near where she usually parked at the University Center. On each occasion she experienced a panic attack.

60. The following day, January 23, Ms. Hensley suffered panic attacks while approaching

campus. She texted Chief of Police Buhl that she wanted to fill out a police report concerning the assault.

61.    Ms. Hensley made the police report on January 23 with the assistance of police officer Robertson. Coworkers gave statements confirming they had noticed Grogan coming to Ms. Hensley's area more frequently since Ms. Hensley arrived.

62.    On January 24, 2019, in the presence of her Assault Services Coordinator from Help-In-Crisis, Ms. Hensley met with Officer Robertson again to provide a sworn statement.

63.    During this meeting, Robertson typed up Ms. Hensley's statement and had her sign it. He told her that NSU's video cameras had recorded Grogan's assault and that the video was consistent with her description of it.

64.    Ms. Hensley asked Officer Robertson, what if there were other victims of Grogan. He informed Ms. Hensley that another woman had recently made a complaint to Campus Police that Grogan had engaged in what Ms. Hensley understood to be similar conduct. He stated that NSU intended to speak with that woman again to see if she would file an official report. He also indicated he was aware of some older complaints against Grogan.

65.    Officer Robertson suggested that a protective order could be useful to Ms. Hensley.

66.    Ms. Hensley thereafter went to the courthouse with her Assault Services Coordinator and a Court Advocate from Help-In-Crisis and requested an emergency protective order with their assistance. The temporary protective order, which she obtained that same day, was served on January 26.

67.    Ms. Hensley met with an EAP counselor on February 4, 2019 and described what she had experienced, the assault and the panic attacks. She received treatment from a Nurse Practitioner, who provided medication for the panic attacks, and counseling.

68.    A Permanent Protective Order was filed and signed by the court on February 7, 2019, which Ms. Hensley conveyed to the NSU campus police. The Protective Order required Grogan not to

commit further acts or threats of abuse toward Ms. Hensley and "to not stalk the Petitioner."

69. On multiple occasions following the conveyance of the Protective Order to NSU campus police, Hensley observed Grogan violating its terms. She called campus police on each occasion to report the violation, but they were unresponsive.

70. JD Young's CFO and Human Resources Director spoke with Ms. Hensley on February 19, 2019 to discuss options that could enable her to work outside the office, for example delivering mail, to prevent Grogan from continuing to stalk her. During this meeting JD Young's representatives stated that they did not think Defendant NSU was responding appropriately to Ms. Hensley's complaints.

71. The District Attorney charged Grogan with Misdemeanor Assault and Battery on February 20, 2019. The charging instrument, to which Grogan later pleaded guilty, specifically alleged that Grogan committed the crime "by willfully and unlawfully . . . grabbing the front waist band of the victim's clothing and placing his fingers partially beneath her clothing, making contact with her bare skin with force and violence."

72. Ms. Hensley stopped parking in the employee parking area in an effort to avoid Grogan. When Grogan parked near her, he increased the odds that Ms. Hensley would encounter him at the end of the day due to their same schedules. She began parking in the visitor's parking lot.

73. However, Grogan then began parking his motorcycle near Ms. Hensley's car in the visitors' area, even though it was not designated for motorcycle parking.

74. On or about March 14, 2019, Grogan parked his motorcycle adjacent to Ms. Hensley in an area where parking was not allowed. Ms. Hensley reported his failure to keep away to JD Young's Human Resources. They replied that they had reached out to Defendant NSU's Human Resources department, but that NSU had been unresponsive.

75. Grogan continued to engage in the same behavior of parking near Ms. Hensley's vehicle

9

in violation of the protective order.

76. On July 3, 2019 Grogan pleaded guilty to "grabbing the front waist band of the victim's clothing and placing his fingers partially beneath her clothing, making contact with her bare skin with force and violence," as charged, a misdemeanor Assault and Battery.

77. On or about July 5, 2019, Grogan aggressively stared at Ms. Hensley in the back dock, an area to which she needed routine access to perform her job. Ms. Hensley called Defendant NSU's Campus Police and stated that Grogan had pleaded guilty to assaulting her two days ago, and was now violating a protective order. She was then visited by an officer who took a statement. The officer's notes corroborate that Ms. Hensley told her that Grogan had pleaded guilty to assaulting her two days ago, and that she was calling the police to report what she believed was a violation of the protective order prohibiting stalking. The officer had misunderstood the initial call to be a report of an assault, but once she interviewed Ms. Hensley, she was clear that Ms. Hensley was not reporting an assault but a violation of the protective order.

78. On July 11, 2019, Defendant President Steve Turner sent a signed letter to JD Young, stating: "Northeastern State University (NSU) hereby respectfully requests the removal of JD Young employee Deanie Hensley from her assignment at NSU effective immediately, and that she no longer have any responsibility or affiliation with the NSU account."

79. On July 15, 2019, Plaintiff filed her Charge of Discrimination with the EEOC.

80. In mid- to late-July, 2019, representatives of JD Young, Defendant President Turner and other NSU representative met concerning Ms. Hensley. They held two face-to-face meetings, the second on July 22.

81. Defendant Turner initially justified his exclusion of Ms. Henley from NSU and its account, by claiming she had falsely reported a second assault by Grogan on July 5. He said video of the incident showed there was no assault. JD Young representatives disputed this. Turner admitted this was

solely an initial misunderstanding by NSU campus police, which Ms. Hensley corrected. In other words, that he was using the initial misunderstanding as a pretext, although he knew she had reported stalking.

82. JD Young's representatives told Turner that there was no other position for Ms Hensley at JD Young, and that as a result of his decision, she would lose her job.

83. They tried to dissuade him from excluding her from work at and for NSU, suggesting other alternatives.

84. Finally, they told Turner what he was doing was unethical and possibly illegal. Defendant Turner stated he wished to retain Defendant Grogan—who had pleaded guilty to assaulting Plaintiff—and banish Ms. Hensley.

85. On July 22, 2019, Defendant Turner informed JD Young's representatives that if they did not take the action he demanded against Ms. Hensley he was terminating NSU's contract with JD Young.

86. JD Young's representatives spoke with Ms. Hensley on July 22, 2019, regretfully telling her that they had no choice but to let her go due to NSU'S threat to rescind their contract unless they terminated her from her position at NSU.

87. JD Young was able to offer Ms. Hensley employment for a limited time following Defendant Turner's ultimatum, but there was no permanent opening for Ms. Hensley at JD Young, and she ultimately had no choice but to take a job paying $20,000.00 per year less than she had earned working at NSU and JD Young.

88. At NSU's discretion, Defendant Turner knowingly caused Ms. Hensley's termination.

89. Adney subsequently provided an unfounded and retaliatory negative employment reference for Ms. Hensley, in response to an inquiry, stating that he would not recommend her for a similar position.

## Count One

### Hostile Work Environment
### In Violation of Title IX
### Against Defendant NSU

90. Plaintiff incorporates by reference all preceding paragraphs.

91. As more fully set forth herein, but without limitation, employees of NSU harassed Plaintiff on the basis of her sex.

92. Defendant NSU had substantial control over the harassment.

93. Officers and employees of Defendant NSU who had authority to correct the problems had actual notice of sexual assaults and sexual harassment by Adney and Grogan, to which they were deliberately indifferent.

94. Officers and employees of Defendant NSU who had authority to correct the problems were deliberately indifferent to the sexual harassment perpetrated by Adney and Grogan against Ms. Hensley and other women.

95. As a consequence of Defendant's deliberate indifference, Adney and Grogan were permitted to sexually harass Plaintiff and Grogan was permitted to sexually assault Plaintiff.

96. She suffered physical and emotional injury and distress, as a result of the sexual assault and battery, and lost wages.

97. Defendant's actions proximately caused Plaintiff's injuries.

## Count Two

### Retaliation
### In Violation of Title IX
### Against Defendant NSU

98. Plaintiff incorporates by reference all preceding paragraphs.

99. Plaintiff engaged in protected activity by complaining to Defendant about the hostile work environment based on her sex and filing her Charge of Discrimination with the EEOC.

100. Defendant retaliated against Plaintiff by, inter alia, issuing her an unfounded negative performance review, causing her discharge, and giving Plaintiff an unfounded negative employment reference.

101. As a consequence of Defendant's conduct, Plaintiff suffered physical and emotional injury and distress, and lost wages.

102. Defendant's actions proximately caused Plaintiff's injuries.

### Count Three

### Hostile Work Environment
### In Violation of Title VII
### Against Defendant NSU

103. Plaintiff incorporates by reference all preceding paragraphs.

104. Defendant NSU engaged in illegal, intentional discrimination on the basis of sex, by creating a hostile work environment on the basis of Plaintiff's female sex.

105. NSU is liable for Adney's and Grogan's sexual harassment because it knew or should have known that they would sexually harass her and failed to take appropriate remedial measures.

106. As a consequence of Defendant's conduct, Plaintiff suffered physical and emotional injury and distress, and lost wages.

107. Defendant's actions proximately caused Plaintiff's injuries.

### Count Four

### Retaliation
### In Violation of Title VII
### Against Defendant NSU

108. Plaintiff incorporates by reference all preceding paragraphs.

109. Plaintiff engaged in protected activity by complaining to Defendant about the hostile work environment based on her sex and filing her Charge of Discrimination with the EEOC.

110. Defendant retaliated against Plaintiff by, inter alia, issuing her an unfounded negative

performance review, causing her discharge, and giving Plaintiff an unfounded negative employment reference.

111. As a consequence of Defendant's conduct, Plaintiff suffered physical and emotional distress and lost wages.

112. Defendant's actions proximately caused Plaintiff's injuries.

## Count Five

### Assault
### In Violation of Oklahoma Common Law
### Against Defendant Randy Grogan

113. Plaintiff incorporates by reference all preceding paragraphs.

114. Defendant Grogan intentionally caused Plaintiff to have a reasonable apprehension of imminent and harmful contact by placing his hands onto her body on her bare skin beneath her clothing.

115. As a consequence of Defendant's conduct, Plaintiff suffered physical and emotional injury and distress.

116. Defendant's actions proximately caused Plaintiff's injuries.

## Count Six

### Battery
### In Violation of Oklahoma Common Law
### Against Defendant Randy Grogan

117. Plaintiff incorporates by reference all preceding paragraphs.

118. Defendant Grogan made intentional and harmful or offensive contact with Plaintiff by placing his hands onto her body beneath her clothing.

119. As a consequence of Defendant's conduct, Plaintiff suffered physical and emotional injury and distress.

120. Defendant's actions proximately caused Plaintiff's injuries.

### Count Seven

### Hostile Work Environment
### In Violation of 42 U.S.C. Sec. 1983 and the Fourteenth Amendment
### Against Defendant Turner in his Individual Capacity

121. Plaintiff incorporates by reference all preceding paragraphs.

122. Defendant Turner, acting under color of state law as Plaintiff's higher-level supervisor, deprived Plaintiff with reckless and/or callous indifference to her federally protected rights, including her rights secured by the Fourteenth Amendment of the U.S. Constitution, as well as rights secured by 20 U.S.C. 1681, consciously acquiesced to the known sexual harassment, and was motivated by evil intent.

123. Specifically, but without limitation, Defendant Turner deprived Plaintiff of equal protection of the laws when she was subjected to a hostile work environment on the basis of her sex, Defendant Turner had actual notice, and deliberately failed to take effective measures to end it.

124. As a consequence of Defendant's conduct, Plaintiff suffered physical and emotional injury and distress.

125. Defendant's actions proximately caused Plaintiff's injuries.

### Count Eight

### Retaliation
### In Violation of Section 1983 and the Fourteenth Amendment
### Against Defendant Steve Turner

126. Plaintiff incorporates by reference all preceding paragraphs.

127. Defendant Turner, acting under color of state law as Plaintiff's higher-level supervisor, deprived Plaintiff with reckless and/or callous indifference to her federally protected rights, including her rights secured by the Fourteenth Amendment of the U.S. Constitution, as well as rights secured by 20 U.S.C. 1681, causing her to be removed from her position because she complained about sexual harassment and sexual assault, and was motivated by evil intent.

128. Specifically, but without limitation, Defendant Turner deprived Plaintiff of equal protection of the laws when he caused her discharge in response to her protected activity, which included complaining about the hostile environment and filing with the EEOC a Charge of Discrimination.

129. As a consequence of Defendant's conduct, Plaintiff suffered physical and emotional injury and distress and lost wages.

130. Defendant's actions proximately caused Plaintiff's injuries.

## JURY DEMAND

Plaintiff herein demands a trial by jury for all issues in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

a. Judgment against Defendants for violations of Title IX, Title VII, 42 U.S.C. Sec. 1983, and the Oklahoma common law, as set forth above;

b. Compensatory damages for physical and emotional injury and distress;

c. Past and future lost compensation;

d. Punitive damages against Defendants Grogan and Turner;

e. An award of prejudgment interest;

f. All costs and attorneys' fees incurred prosecuting these claims; and

g. For such further relief as the Court deems just and equitable.

Dated: January 16, 2020
       Mamaroneck, NY

Local Counsel:

By: __/s/ Mark E. Hammons__
Mark E. Hammons
OBA No. 3784

Hammons, Gowens, Hurst & Associates
325 Dean A. McGee Avenue
Oklahoma City, OK 73102
Telephone: (405) 235-6100
Fax: (405) 235-6111
mark@hammonslaw.com

Friedman & Houlding LLP

By:＿＿/s/  Giselle Schuetz＿＿＿
Giselle Schuetz
NY No. 4973608
Joshua Friedman
NY No. 2100758
Attorneys for Plaintiff
1050 Seven Oaks Lane
Mamaroneck, NY 10543
Telephone:  (888) 369-1119 x8
Fax: (866) 731-5553
giselle@friedmanhouldingllp.com
josh@friedmanhouldingllp.com
*To Be Admitted Pro Hac Vice*